IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FEDERAL DEPOSIT INSURANCE ) CASE NO.  1:10 CV 1298
CORPORATION, )
 )
     Movant, ) JUDGE DONALD C. NUGENT
 )
     v. )
 ) MEMORANDUM OPINION
AMTRUST FINANCIAL ) AND ORDER
CORPORATION, )
 )
     Respondent. )

This matter is before the Court on Cross-Motions for Summary Judgment brought by the

parties.   AmTrust Financial Corporation ("AFC") filed its *Debtor's Motion for Summary*

*Judgement on Capital Commitment Claim*, arguing that the Court should find as a matter of law

that it did not make any commitment to maintain the capital of AmTrust Bank (ECF # 25).  The

Federal Deposit Insurance Corporation, in its capacity as Receiver of AmTrust Bank ("FDIC-R")

filed its *Motion Of The Federal Deposit Insurance Corporation For Partial Summary Judgment*

*Against AmTrust Financial Corporation*, arguing that AFC did make an unambiguous

commitment to maintain the capital of AmTrust Bank, and asking the Court to conduct a hearing

only as to the amount of that commitment .  (ECF #27)  Each party filed an opposition to the

other's motion, and the Holders of Senior Notes joined in AmTrust's opposition to the motion of

the FDIC-R.  (ECF #40, 46, 47, 54).[1]  Wilmington Trust Company as indenture trustee for

AmFin Financial Corporation's 9.50% Junior Subordinated Deferrable Interest Debentures due

2027, and the Official Committee of Unsecured Creditors of AmFin Financial Corporation also

filed Memorandum in Support of AFC's Motion and in Opposition to the motion of the FDIC-R.

(ECF #51, 52).  Both AFC and the FDIC-R filed Reply briefs in support of their position, (ECF

#58, 59, 60, 63).[2]

The Court heard arguments on the motions for summary judgment at a status conference

held on December 1, 2010, and granted leave for the parties to file supplemental briefs on the

primary issues.  On December 12, 2010, the parties filed a *Statement of Facts Stipulation

Between the Federal Deposit Insurance Corporation and AmTrust Financial Corporation

Involving Documents and Uncontested Facts Relating to the Court's Consideration of the

Capital Maintenance Proceeding* (ECF #67), and on December 15, 2010 each party filed a

Supplemental Brief in support of its respective position.  (ECF # 77, 78).  Also on December 15,

the Holders of Senior Notes filed a supplement to their notice of Joinder in AFC's  Motion for

Summary Judgment.  (ECF #76).

Having carefully and deliberately considered all of the filings in this action, along with

all relevant documents and testimony, and the applicable law, the Court finds that the language

in the documents that allegedly created AFC's commitment to maintain the capital of AmTrust

---

[1] There are two docket entries for many of the FDIC-R's filings.  Although both parties
have filed motions and responses under seal, the FDIC-R also filed redacted versions of its
filings that were available on the public docket.

[2] AmTrust amended its original Reply Brief in Support of Motion for Summary Judgment
on Capital Commitment Claim (ECF #55, 63).

Bank is ambiguous, and there are genuine and material questions of fact that must be resolved in order to determine whether the any such commitment was actually made.

## PROCEDURAL HISTORY

AmTrust Financial Corporation ("AFC") (now know as AmFin Financial Corporation), is a "savings and loan holding company" for the "savings association," AmTrust Bank ("the Bank").[3]  The Office of Thrift Supervision ("OTS") is a federal regulatory agency that has the authority to regulate and examine the financial affairs of savings associations and of holding companies.  12 U.S.C. §§ 1811 *et seq*.; 12 U.S.C. §§ 1461 *et seq*..[4]  On November 30, 2009, AFC filed a voluntary petition for relief under Title 11 of the Bankruptcy Code. The OTS closed AmTrust Bank ("the Bank") four days later, and the FDIC was appointed as receiver of the Bank.  The FDIC, as receiver,  took over all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, account holder, depositor, officer, or director of the bank, and has the power to liquidate and "proceed to realize upon its assets." 12 U.S.C. § 1821(d)(2)(A)(I); 12 U.S.C. § 1821(d)(2)(E).

In accordance with these rights, the FDIC-R seeks to recover monies allegedly owed as a result of commitments AFC made to the OTS to maintain the capital of the Bank.   To this end,

---

[3]

 The parties do not dispute that AFC is a "savings and loan holding company" within the meaning of 12 U.S.C. § 1813(w)(3) and 12 U.S.C. § 1467a, or that AmTrust Bank is a "savings association" within the meaning of 12 U.S.C. § 1813(b) and 12 U.S.C. §1462(4). See, *Stipulation Between the Federal Deposit Insurance Corporation And AmTrust Financial Corporation Involving Documents And Uncontested Facts Related to the Court's Consideration of The Capital Maintenance Proceeding*.  (ECF # 67).

[4]  See *Id*.

the FDIC-R filed in the Bankruptcy Court a motion for an order, pursuant to 11 U.S.C. § 365(o), requiring AFC to immediately cure the deficits under the alleged capital maintenance commitments it made to the OTS promising to maintain the capital of AmTrust Bank ("Motion to Cure") (Case No. 09-21323, Docket No. 371).

The FDIC-R moved this Court to withdraw this issue from the bankruptcy reference, pursuant to 28 U.S.C. § 157(d).  (ECF #1).  The Court granted that motion and ordered the withdrawal of the bankruptcy reference with respect to all proceedings related to the FDIC-R's motion to require AFC to immediately cure any deficit under its alleged commitments to maintain the capital of AmTrust Bank.  The Court further ordered a stay of the bankruptcy proceedings pending resolution of this matter. (ECF #5).

## **FACTS**[5]

Although the parties vehemently disagree on the interpretation to be given to the facts and the application of law to facts in this case, the facts, themselves, are largely undisputed.

Pursuant to the Financial Institutions Reform Recovery, and Enforcement Act of 1989, ("FIRREA"), the OTS is the primary regulator of savings associations and their holding companies.  As such, OTS  has the authority to enforce various provisions of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811, et seq. ("FDIA") and the Home Owner's Loan Act, 12 U.S.C. §§ 1461, *et seq..* ("HOLA") against those savings associations and holding companies.   This

---

[5] The facts are taken primarily from the *Stipulation Between the Federal Deposit Insurance Corporation And AmTrust Financial Corporation Involving Documents And Uncontested Facts Related to the Court's Consideration of The Capital Maintenance Proceeding*.  (ECF # 67).  Other undisputed historical facts are taken from the briefs of the parties.  Facts that are in dispute will be noted as such in the accompanying discussion.

includes the power to conduct Examinations of savings associations and holding companies,

pursuant to 12 U.S.C. §§  1464(d)(1)(B)(I), 1464(d)(6), and 1467a(b)(4), and 12 C.F.R. §

563.170.  The OTS also had the authority to issue Cease and Desist Orders to savings

associations and holding companies pursuant to 12 U.S.C. § 1818(b)(1) and (3).  This authority

allows the OTS, among other things, to require an institution to cease and desist from unsafe or

unsound practices, and to require an institution to "take affirmative action to correct the

conditions resulting from any such violation or practice."  12 U.S.C. §1818(b)(1). A cease and

desist order issued pursuant to 12 U.S.C. § 1818(b) shall remain "effective and enforceable" as

provided therein, except to such extent as it is stayed, modified, terminated, or set aside by action

of the agency or a reviewing court.  12 U.S.C. § 1818 (b)(2).

      AFC was a "savings and loan company" within the meaning of 12 U.S.C. § 1813(w)(3)

and 12 U.S.C. § 1467a(a)(1)(D), and was therefore, subject to regulation by the OTS.  AmTrust

Bank was a "savings association" within the meaning of 12 U.S.C. § 1813(b) and 12 U.S.C. §

1462(4), and was also subject to regulation by the OTS.  AmTrust Bank was also an "insured

depository institution" withing the meaning of 12 U.S.C. § 1813©, meaning that the FDIC

insured the deposits at this savings bank.  AFC is an "institution affiliated party" of AmTrust

Bank within the meaning of 12 U.S.C. § 1813 (u)(1).

      On or about June 18, 2008, the OTS sent, and AFC received, a copy of a Report of

Examination outlining the findings OTS made during a risk-focused examination of AFC

conducted on or about November 30, 2007, pursuant to its authority under 12 U.S.C.

§ 1464 (d)(1)(B)(I) and 12 U.S.C. § 1467a(b)(4).  The report outlined the current "risk and

complexity" of AFC's structure, and required that the Board of AFC provide the OTS "with a

business plan that provides for reduction of risk and enhancement of capital for the consolidated company." (ECF #67, Ex. 5).  On or about July 10, 2008, the Bank entered into a Memorandum of Understanding with OTS agreeing in part to develop and submit a strategic business plan ensuring the incorporation of detailed capital preservation and enhancement strategies.  (ECF #67, Ex. 10).[6]

In response to the OTS requirements,[7] AFC and the Bank jointly submitted a Management Action Plan that included a Capital Management Policy approved by AFC's Board of Directors.  (ECF #67, Ex. 13).  The purpose of the Capital Management Policy (the "CMP") was to "establish a framework for planning and managing capital adequacy on an enterprise-wide basis for [AFC] and [the Bank].  (ECF #67, Ex. 14).  The CMP set forth objectives, goals, assessment policies, assessment measures, and limits and targets for AFC and the Bank's collective capital position.  (ECF #67, Ex. 13, 14).  Under the section captioned "Capital Adequacy Objective,"the policy established limits for maintaining  the collective capital positions of AFC and the Bank.   These limits were defined as "absolute minimums and maximums that are not to be breached." [8]  (ECF #67, Ex. 13, 14)  The defined limits were as

---

[6]AFC was not a party to the Memorandum of Understanding.

[7] Although the Debtors argue that AFC was not required to submit the Capital Management Policy, the stipulated documents provide evidence suggesting that the submission was part of a broader Management Action Plan that was submitted to the OTS, at least in part in "response[] to issues and requirements identified ... as Matters Requiring Board Attention in [the OTS's Report of Examination] of AmTrust Financial Corporation ..."  transmitted on June 18, 2008.  (ECF # 67, Ex. 13).  The Report of Examination specifically required AFC to "provide OTS with a business plan that provides for reduction of risk and enhancement of capital for the consolidated company."  (ECF # 67, Ex. 5, pg. 3).

[8] The policy went on to state that "[i]n the unusual event [that the limits are breached],

-6-

follows:

- Tier 1 leverage/Tangible equity to assets of 7 percent.
- Tier I risk based capital to risk weighted assets of 10.5 percent
- Total risk based capital to risk weighted assets of 11.5 percent
- Dividend Payout Ratio (per dividend guidance in this Policy)

(ECF #67, Ex. 13, 14).  The targets were set at higher percentages.

Also in response to the OTS requirements, the Bank submitted to the OTS, on behalf of "AmTrust Bank & Subsidiaries,"[9] a three year strategic business plan that indicated AFC was "in process of raising $475 million (after transaction costs) of new capital" and called for "capital infusions from the holding company to AmTrust Bank ("Bank") that are sufficient to achieve our problem asset reduction strategies, absorb accompanying losses, provide appropriate reserves, and improve the Bank's capital ratios from their current levels."  (ECF #67, Ex. 15, pg. 1).  Under the heading "Major Planning Assumptions," and the sub-heading "Capital," the plan went on to state that AFC "plans to raise approximately $500 million in capital through the issuance of common or convertible preferred stock.  Proceeds of the offering, net of issuance costs, are expected to total $475 million. [AFC] will contribute approximately $240 million of proceeds from the offering to Bank capital by September 30, 2008 and an additional $60 million

---

contingency plans must be implemented within thirty (30) days to restore capital and/or capital ratios back to levels that comply with the limits."  (ECF #67, Ex. 14).

[9]

AFC is a subsidiary of the Bank.  The minutes of the Joint Board of Directors meeting of AFC and the Bank on July 30, 2008, indicate that AFC's Board adopted and approved the Management Action Plan and the letter to the OTS dated July 20, 2008, and resolved that "any actions taken, amounts expended, documents signed or delivered or commitments undertaken on behalf of AFC or the Bank with respect to the subject matter of the [Management Action Plan and the letter dated July 20, 2008] or any portion thereof are ratified, confirmed and approved."  (ECF #67, Ex. 11, pg. 5).

in March 2009 . . . ."  (ECF #67, Ex. 15, pg. 4).   The expected capital infusions of $240 million and $60 million from AFC to the Bank are referenced again in the final paragraph of this same section.[10]

On or about September 30, 2008, the OTS sent and the Bank received a Report of Examination conducted beginning on August 25, 2008.  The Examination Conclusions and Comments noted that management for the Bank submitted an acceptable business plan to OTS in response to a Memorandum of Understanding that was entered into as a result of the July 15, 2008 examination report.  However, OTS stated that "[t]he plan assumed that the bank would receive a substantial capital infusion by September 30, 2008, which did not occur, therefore, the business plan is obsolete."   The report also notified the Bank that its Composite rating had been downgraded, that the bank was operating in an "unsound and unsafe" condition, and that it was deemed to be in "Troubled Condition" as defined by 12 C.F.R. § 563.555.  (ECF #67, Ex. 20). Based on the examination of the Bank and its designation as troubled, AFC was also notified that it's own composite rating was being downgraded, and that the OTS also considered it to be in "Troubled Condition" as defined by 12 C.F.R. § 563.555.  (ECF #67, Ex. 21).

Subsequently, on or about November 19, 2008, the OTS issued separate Cease and Desist orders to the Bank, and to AFC.  (ECF #67, Ex. 28, 30).  Both the Bank and AFC entered into a *Stipulation and Consent to Issuance of Order to Cease and Desist* ("Stipulation and Consent") for their respective Cease and Desist orders.  (ECF #67, Ex. 29, 31).  Both Cease and Desist orders were premised, at least in part, on the failure of the Bank and of AFC to "meet the specific

_____

[10]

"In addition, a $240 million capital infusion will be provided by [AFC] in September 2008 and an additional $60 million in March 2009."  (ECF #67, Ex. 15, pg. 5).

capital enhancement and preservation requirements contained within [their] business plan. . . ."
(ECF #29, ¶ 2; ECF #31, ¶2).

The Bank's stipulated Cease and Desist order required, among other things, that the Bank
"have and maintain: (I) Tier 1 (Core) Capital Ratio of at least seven percent (7%) and (ii) a Total
Risk-Based Capital Ratio of at least twelve percent (12%)."  These ratios were ordered to be
obtained "by no later than December 31, 2008" and maintained "at all times thereafter."  (ECF
#67, Ex. 28, ¶1).  The Bank's Stipulation and Consent specified that "[t]he terms of this
Stipulation and of the Order represent the final agreement of the parties with respect to the
subject matters thereof, and constitute the sole agreement of the parties with respect to such
subject matter." (ECF #67, Ex. 29, ¶8(e)).  By its terms, the Order remains in effect until
"terminated, modified, or suspended in writing by the OTS. . . ."  (ECF #67, Ex. 29, ¶8(f)).  On
November 25, 2008, the OTS sent a notice to the Bank advising it that the previous
Memorandum of Understanding between the parties (effective July 15, 2008) was terminated on
November 19, 2008 upon the issuance of the Bank's Cease and Desist Order.  (ECF #67, Ex. 33;
*see also* Ex. 56, pg. 19).

AFC's stipulated Cease and Desist order required the "Holding Company" to submit for
approval "a detailed capital plan to attain no later than December 31, 2008 and maintain at the
Holding Company's wholly-owned savings association subsidiary, AmTrust Bank . . . (I) Tier 1
(Core) Capital Ratio of at least seven percent (7%) and (ii) Total Risk-Based Capital Ratio of at
least twelve percent (12%)." (ECF #67, Ex. 30, ¶ 4).  It also requires the Board of Directors of
AFC to "ensure that [the Bank] complies with all of the terms of its Order to Cease and Desist
issued by OTS on November 19, 2008."  (ECF #67, Ex. 30, ¶ 8).  AFC's Stipulation and Consent

specified that "[t]he terms of this Stipulation and of the Order represent the final agreement of the parties with respect to the subject matters thereof, and constitute the sole agreement of the parties with respect to such subject matter." (ECF #67, Ex. 31, ¶8(e)).  By its terms, this Order also remains in effect until "terminated, modified, or suspended in writing by the OTS. . . ." (ECF #67, Ex. 31, ¶8(f)).

The Bank did not meet the capital ratio requirements set forth in its Cease and Desist Order by the deadline of December 31, 2008.  (ECF #67, Ex. 56, pg. 60).  In January of 2009,[11] the Bank submitted a risk reduction plan to the OTS for approval.  The plan did not include a means to achieve the 7% and 12% ratios mandated by the Cease and Desist Order, but pledged to maintain Tier 1 Core and Total Risk-Based capital ratios about 4% and 8% respectively.  (ECF #67, Ex. 44, 45).   February 20, 2009, following a review of the submitted plan, OTS approved the reduced parameters of the plan, subject to several oversight conditions.  In its conditional acceptance of the plan, the OTS did specifically state, however, that its "non-objection for AmTrust Bank to operate under the plan continues for so long as the execution of the plan is successful in meeting its principal objectives and there is no material decline in the financial condition of AmTrust Bank beyond that which is projected in the plan."  (ECF #67, Ex. 49).

On November 4, 2009, the OTS notified the Bank that it had become "Significantly Undercapitalized" and subject to "Prompt Corrective Action" ("PCA") within the meaning of 12 U.S.C. § 1831o(b) and 12 C.F.R. § 565.4(b).  (ECF #67, Ex. 77).  The Bank's Total Risk-Based Capital Ration was found to be 5.29%, with a Tier 1 Risk-Based Capital Ratio of 4.00%.  (ECF

---

[11]

  The plan was originally due sooner, but the Bank obtained an extension until January 5, 2009, for the filing of the plan.  (ECF #67, Ex. 47).

#67, Ex. 77).  As a result the Bank was required, under 12 C.F.R. § 565.3(b),  to submit a capital restoration plan or plan amendment to OTS withing 45 days of receiving the notice. The plan was to provide a means by which the Bank could return to the adequately capitalized ratio levels set forth in the previously approved risk reduction plan.  (ECF #67, Ex. 77, Attach. A).  The OTS also advised the Bank that it could not accept a PCA capital restoration plan unless each company that directly or indirectly controls the Bank "guarantees that the [Bank] will comply with its plan until it is adequately capitalized for four consecutive quarters, and ... provides appropriate assurances of performance."  (ECF #67, Ex. 77, Attach. A).  The PCA Standard Form of Guarantee and Assurances that AFC would be required to sign as a condition for the acceptance of the PCA capital restoration plan included, among other things, a commitment that AFC "utilize its available assets, when directed to do so by OTS, to enable the Bank to implement its capital restoration plan," subject to the limitations contained in 12 U.S.C. § 1818(b)(1), (9).[12]  (ECF #67, Ex. 77, Attach. C).   The Bank never filed the PCA capital restoration plan, and AFC never executed the standard Form of Guarantee and Assurances.

AFC filed a petition for Chapter 11 reorganization on November 30, 2009.  On December 4, 2009, the OTS closed the Bank and appointed the FDIC as receiver.

**LEGAL STANDARD**

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

[12]

 For purposes of this guarantee, "available assets" did not include shares of the Bank held by the Holding Company or of any intermediate holding company of the Bank held by the Holding Company.  (ECF #67, Ex. 77, Attach. C).

law." FED. R. CIV. P. 56©.  The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56©).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  The court will view the summary judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).  Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citations omitted).  In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.  However, if the non-moving party faces a heightened burden of proof, such as clear and

convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmovant.  The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate.  *Id.*

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible.  The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'"  *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  FED. R. CIV. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify.  Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit.  Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted).  However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the

defect.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id*. at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter.  *Id.* at 249.  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.  It is with this standard in mind that the instant Motion must be decided.

## ANALYSIS

The question  at issue in this case is whether AFC faces a "deficit under any commitment ... to a Federal depository institutions regulatory agency . . . to maintain the capital of" AmTrust Bank, as contemplated by 11 U.S.C. § 365(o).  Section 365(o) provides as follows:

-14-

> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depositary institutions [sic] regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under 507.  This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

11 U.S.C. §365 (o).

In this case, the FDIC-R contends that AFC should be deemed to have "committed to maintain the capital of AmTrust Bank," for purposes of § 365(o), by virtue of three separate documents submitted by AFC to the OTS.  These include:  (1) the Capital Management Policy AFC submitted to the OTS on July 30, 2008; (2) the three year strategic business plan, submitted to the OTS on August 8, 2008; and, (3) AFC's Stipulation and Consent to the formal Cease and Desist Order issued by the OTS on November 19, 2008.  The Debtor contends that none of these documents contained a commitment by AFC to maintain the capital of AmTrust Bank.

The parties agree that when the terms of an agreement are clear and unambiguous, the Court need not consider any evidence beyond the plain language of the agreement in order to determine the rights and obligations of the parties.  *See Ferro Corp. v. Cookston Group, PLC*, 585 F.3d 946, 950 (6th Cir. 2009); *Med Billing, Inc. v. Med. Mgmt. Sciences, Inc.*, 212 F.3d 332, 335 (6th Cir. 2000).  "When contract terms are clear and unambiguous, a court must accord those terms their plain meaning."  *Verizon Advanced Data, Inc. v. FrogNet, Inc.*, 2010 U.S. Dist. LEXIS 32595, *21 (S.D. Ohio Apr. 2, 2010).   On the other hand, the terms of an agreement or commitment are considered ambiguous if their meaning cannot be clearly discerned from the four corners of the document in which they are contained, or when the language can is

-15-

susceptible of more than one reasonable interpretation.  *See Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008).  The parties also agree that if an ambiguity exists, the Court may consider extrinsic evidence, and utilize other traditional methods of contract interpretation to discern the true terms or meaning of the agreement.  *See Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996).

Both parties in this action contend that the language in the documents containing the alleged commitments to maintain the capital of the bank is unambiguous and clear, however, each believes that the supposedly clear and unambiguous language means something markedly and materially different.  Further, both parties contend that even if the Court were to determine that the language in the documents creating the alleged commitments is ambiguous, extrinsic evidence and general principles of contract interpretation would support their own conclusion as to the meaning of the disputed terms.

Title 11 does not specify any particular form that a "commitment to maintain the capital of an insured depository institution" must take, or otherwise provide any guidance as to how to determine whether such a commitment has been made.  According to the legislative history of this statute, Congress enacted section 365(o) "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."  H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990), *reprinted in* 1990 U.S.S.C.A.N. 6472, 6585.  There have been only a handful of cases across the country that have been faced with the question of determining whether a holding company made a commitment to maintain the capital of an FDIC insured bank for purposes of 11 U.S.C. § 365(o).  The question has not yet been addressed by any court within the Sixth Circuit.

-16-

In four of the five cases cited by the parties, the courts found that a commitment to maintain capital" had been made, and that 11 U.S.C. § 365(o) was applicable. *See Wolkowitz v. Fed. Deposit Ins. Corp.*, 527 F.3d 959, 973 (9th Cir. 2008); *Office of Thrift Supervision v. Overland Park Fin. Corp.*, 236 F.3d 1246, 1252 (10th Cir. 2001); *Resolution Trust Corp. v. Firstcorp, Inc.,* 973 F.2d 243 (4th Cir. 1992); *Franklin Savings Corp. v. Office of Thrift Supervision*, 303 B.R. 488, 491 (D. Kan 2004).  The fifth found that no such commitment had been made.  *See In re Colonial Bancgroup*, 2001 Bankr. LEXIS 2772 (Bankr. M.D. Ala. Sept. 1, 2010).  None of these cases are controlling in the instant action, and they are of limited persuasive influence because the language allegedly creating the commitment in this case is materially different than the language that created the alleged commitments in each of the other five cases that have addressed this issue.

The parties agree that these cases stand for the general proposition that Section 365(o) was enacted to "prevent a holding company from evading its commitments in bankruptcy" and that a commitment under that section is "an agreement or pledge to do something."  (ECF #27, pg. 9-10; ECF #40, pg. 2).  Beyond that, there is little agreement as to the scope of the holdings in each case.  In the first four cases, the courts were all presented with agreements that involved written commitments by a holding company, specifically promising to either "infuse sufficient additional equity capital" into a subsidiary bank, or "absolutely, unconditionally and irrevocably guarantee... the performance" of a subsidiary bank.  *See Wolkowitz*, 527 F.3d 959; *Overland Park Fin. Corp.*, 236 F.3d 1246;  *Firstcorp, Inc.,* 973 F.2d 243;  *Franklin Savings Corp.*, 303 B.R. 488 (D. Kan 2004).

There is no doubt that the language at issue in this case does not explicitly state that AFC

will "infuse" capital or "absolutely, unconditionally and irrevocably guarantee" the performance of the Bank.  However,  nothing in the holdings of these four cases would indicate that these precise words or phrases are required in order to find that a commitment has been made to maintain the capital of an FDIC insured bank.  Further, the statute does not require a commitment to "infuse equity capital," or an "absolute guarantee of performance," although such promises are clearly included in the realm of "commitments to maintain capital."

AFC contends that the language creating the alleged commitments in this case is the functional equivalent of the language used to create the alleged commitments in the *Colonial* case, which language that court found clearly and unambiguously failed to create a commitment to maintain the capital of the bank.  *In re Colonial Bancgroup, Inc*., 2010 Bankr. LEXIS 2772 (Bankr. M.D. Ala. Sept. 1, 2010).  This Court disagrees with the strength of the parallels AFC has drawn between the two cases.

Though the facts in *Colonial* were similar with regard to the history of the bank's distress, and the relationship between the holding company and the bank, the language of the alleged agreements was materially different.   The holding Company in *Colonial* pledged to "**assist** its subsidiary bank in addressing weaknesses. . . and achieving/maintaining compliance with its . . . Memorandum of Understanding;" to "**tak[e] steps designed to ensure** that the Bank complies with the Memorandum of Understanding;" and, to "**take appropriate steps to ensure** that the Bank complies with the Order to Cease and Desist."  *Colonial* at *41-42 (emphasis added).

As the court found in *Colonial*, the alleged commitments in that case were no more than promises to assist or to attempt, through the implementation of "appropriate steps," to ensure that

-18-

the bank met its obligations under its MOU and Cease and Desist Orders. By including the words "assist," and "take appropriate steps," the language of the agreements explicitly disclaimed any commitment to actually obtain a specific result. These words constitute a promise to attempt to facilitate a goal, without promising or guaranteeing that the goal will be reached. In this case, no such qualifying language was used. The documents AFC submitted to the OTS set forth capital ratios that were "absolute minimums and maximums that are not to be breached," (ECF #67, Ex. 15, pg. 13, 14); called for "capital infusions from the holding company to AmTrust Bank ("Bank") that are sufficient to achieve our problem asset reduction strategies, absorb accompanying losses, provide appropriate reserves, and improve the Bank's capital ratios from their current levels," (ECF #67, Ex. 15, pg. 1); stated that AFC "will contribute approximately $240 million of proceeds from the offering to Bank capital by September 30, 2008 and an additional $60 million in March 2009 . . . ." (ECF #67, Ex. 15, pg. 4); and, agreed that it's Board "shall ensure that the Association complies with all of the terms of its Order to Cease and Desist issued by OTS on November 19, 2008," (ECF #67, Ex. 30, ¶ 8).[13] The language at issue in this case is more direct than the language in the *Colonial* case, and when isolated in this manner appears, on its face, to be directed at ensuring a specific result, not just promising a vague level of assistance, or pledging to take unspecified "appropriate steps" toward the achievement of a particular outcome.

In short, because the language of the alleged commitments in this case is clearly distinguishable from the language used in cases where a commitment has been found to be unambiguously present, and is also clearly distinguishable from the language used in the one

---

[13] The Bank's Cease and Desist Order required it to maintain specific capital ratios.

case where a commitment was found to be unambiguously absent, the five cases previously decided on this issue offer little guidance in the initial determination of whether the documents in this case are ambiguous or unambiguous with regard to the creation of a commitment to maintain the capital of the Bank.  Therefore, the Court must review the plain language that is asserted to contain an alleged commitment, as well as the context of the documents in which that language appears, in order to determine whether AFC either clearly committed to maintain the capital of the Bank, or whether it clearly did not commit to maintain the capital of the bank.  If neither of these two conclusions is clearly and unambiguously warranted, there would remain a question of fact on this issue that is best determined at trial.

A.  Capital Management Policy/ Three Year Strategic Business Plan

The first alleged commitment is found in the Capital Management Policy approved by AFC's Board of Directors, and submitted to the OTS in July of 2008.  The Capital Management Policy was submitted jointly by AFC and AmTrust Bank in response to a Report of Examination requiring the Board of AFC to provide the OTS "with a business plan that provides for reduction of risk and enhancement of capital for the consolidated company," and a Memorandum of Understanding entered into between OTS and the Bank.  (ECF #67, Ex. 5, 13).

The stated purpose of the Capital Management Policy was to "establish a framework for planning and managing capital adequacy on an enterprise-wide basis for [AFC] and [the Bank]. (ECF #67, Ex. 14).  The policy set forth objectives, goals, assessment policies, assessment measures, and limits and targets for AFC and the Bank's collective capital position.  (ECF #67, Ex. 13, 14).  Under the section captioned "Capital Adequacy Objective,"the policy established

limits for maintaining the capital positions of AFC and the Bank, collectively.  These limits were defined as "absolute minimums and maximums that are not to be breached."  (ECF #67, Ex. 13, 14)  The defined limits were as follows:

- Tier 1 leverage/Tangible equity to assets of 7 percent.
- Tier I risk based capital to risk weighted assets of 10.5 percent
- Total risk based capital to risk weighted assets of 11.5 percent
- Dividend Payout Ratio (per dividend guidance in this Policy)

(ECF #67, Ex. 13, 14).  The targets were set at higher percentages.  The FDIC-R contends that the plain and unambiguous language of the Capital Management Policy ("CMP"), as set forth above, constitutes a commitment by AFC to maintain the capital levels of the Bank at or above the ratios defined as absolute limits in the section of the policy captioned "Capital Adequacy Objective."

In addition, the FDIC-R claims that the three-year strategic business plan submitted to the OTS by AFC and the Bank in August of 2008 (also in response to OTS's Report of Examination of AFC, and the Memorandum of Understanding between OTS and the Bank) included a commitment that AFC would raise $500 million in new capital and would contribute approximately $300 million in capital to the Bank by September 30, 2008.  (ECF #27).   There appears to be no dispute that neither of these alleged commitments were satisfied.

AFC argues that the Capital Adequacy Objectives in the CMP, are not commitments, but rather constitute non-binding goals or aspirations, and internal policies.  AFC does not specifically address the FDIC-R's argument with regard to the Capital Major Planning Assumptions set forth in the three year strategic business plan, and the FDIC-R does not focus heavily on this section its arguments either.  Although the language in the strategic business plan

-21-

is much more direct and detailed with regard to the expected contributions by AFC to the Bank, similar arguments remain in support of AFC's position with regard to whether the plan was intended to be an internal policy or aspirational goal.  As will be addressed below, there are also questions of fact as to whether any alleged commitments contained within these documents were "terminated by an act" of the OTS.

There is support for both parties' positions within the four corners of the CMP.   On the one hand, the CMP states that is purpose and scope is "to establish a framework for planning and managing capital adequacy on an enterprise-wide basis for [AFC] and [the Bank]."  (ECF # 67, Ex. 14).  It lists the limits under a heading entitled "Capital Adequacy Objectives," which would connote a goal versus a requirement, and indicates that AFC "desires" (as opposed to commits) to maintain ratios consistent with the OTS's requirements for "well-capitalized" status.   Further, after listing the limits and targets, the CMP states that "AmTrust Boards, together with management, shall periodically reassess, and adjust as necessary, the ongoing appropriateness of the aforementioned limits and targets in conjunction with prevailing business strategies and risk levels."  (ECF # 67, Ex. 14).  Each of these excerpts would suggest a context in which the limits and targets may have been aspirational or situational, and were not meant to be a binding commitment to maintain capital ratios at the described levels.[14]

On the other hand, the CMP lists objectives or considerations of the policy in a separate section apart from the setting of capital ratio limits; it indicates that the document contains both

---

[14]

  Under the definitions set forth in the CMP, the capital ratios also appear to apply to the Bank and AFC collectively.  There remains a question of fact as to whether this means that each entity was to maintain the stated level of capital ratios, whether the ratios applied to the combined capital levels of the two entities, or whether AFC was jointly responsible for maintaining the Bank's capital levels at the stated ratios.

policies and  "requirements" and it requires that the Chief Financial Officer "shall ensure" that appropriate resources are available to "achieve compliance."  The CMP also addresses regulatory requirements and restrictions and is, therefore, not necessarily limited to providing a framework for internal policy and procedures.  Further, the section on limits and targets distinguishes between aspirational goals (targets), and absolute minimums to be maintained (limits), and, as argued by the FDIC-R, it provides that in the event the absolute limits are breached, AFC is required to "restore capital and/or capital ratios back to levels that comply with the limits."  (ECF #67, Ex. 14).[15]  Further, AFC argues that the CMP was intended to remain flexible, however, the Memorandum of Understanding between the OTS and the Bank specifically prohibited any "major modifications of the Business Plan... without prior written Regional Director approval."  (ECF # 67, Ex. 10).  Although AFC was not a party to the Memorandum of Understanding, the Management Action Policy, which includes the CMP and the three year strategic business plan as tabs, was submitted as a joint plan/policy of the Bank and AFC, pursuant to both the Memorandum of Understanding and a Report of Examination that applied to AFC.

Separate and apart from the arguments addressing the specific language and context provided in the CMP, AFC contends that the CMP could not have been a binding commitment to

---

[15]

AFC mistakenly argues that this is a misstatement of the requirements set forth in the Policy, citing a later passage that addresses breaches to the targets (not the limits) set forth in the CMP. (ECF #40, pg. 6; see also ECF #51).  The CMP states that if targets are breached, the Management must identify reasons and provide the Boards a plan to restore capital back to the targeted levels.  However, the FDIC-R is correct that the CMP's provision with regard to a breach of the absolute limits is more compelling, requiring that AFC actually restore capital and/or capital ratios back to levels that comply with the limits, not just identify problems and create a plan for restoration.  (ECF #67, Ex. 14).

the OTS because AFC was not required to submit that plan by the OTS.  There is some evidence to refute this position, however.  The stipulated documents show that the submission of the Management Action Plan, which contained the CMT as an attachment (Tab C) was in "response[] to issues and requirements identified ... as Matters Requiring Board Attention in [the OTS's Report of Examination] of AmTrust Financial Corporation ..."  transmitted on June 18, 2008.  (ECF # 67, Ex. 13).  The Report of Examination specifically required AFC to "provide OTS with a business plan that provides for reduction of risk and enhancement of capital for the consolidated company."  (ECF # 67, Ex. 5, pg. 3).[16]  Based on its content, the CMP appears to satisfy this requirement.  The CMP was submitted as an attachment to the Management Action Plan, which also incorporated an executive summary of the three year strategic business plan,[17] and it addressed the reduction of risk, and enhancement of capital for the consolidated company.

Further, even if the CMP was not a required submission, AFC could still have made a commitment proactively or voluntarily in order to gain the confidence of the OTS and attempt to influence its handling of the clearly declining capital levels at the Bank.  Therefore, a question with regard to which parts of the submission, if any, were required to be submitted by AFC in

---

[16] It is unclear whether AFC contends that the only the three year strategic business plan was required to satisfy the Report of Examination, whether the Management Action Plan should be deemed to satisfy the requirements without consideration of the CMP or the three year strategic plan, or whether AFC believes no submission was actually required.  It should be noted, however, that if the three year strategic business plan was the required submission, it too contained alleged commitments to maintain the capital of the bank, and explicitly called for an infusion of capital from AFC to the Bank.

[17] Although the actual strategic business plan was not submitted until August 8, 2008, the original submission of the Management Action Plan, submitted July 30, 2008 showed the business plan as an attachment (Tab A) to the main Management Action Plan, and indicated that an executive summary was included at that tab, pending completion of the full business plan which would be submitted at a later date.

-24-

response to the June 18, 2008 Report of Examination; whether the mere submission of the plan (or some part of it) satisfied the OTS requirement, or whether the OTS expected or required that the details of the plan must be actually effectuated in order for AFC to be in compliance with its requirements; and, whether AFC made a voluntary but binding commitment, upon which the OTS was entitled to rely, in order to avoid further regulatory actions or consequences.[18]

Based on the combination of the specific language creating the alleged commitments and the context of the documents in which that language is contained, the Court cannot say as a matter of law that these documents evidence an unambiguous commitment to maintain the capital of the bank, nor can it say as a matter of law that no such commitment was contained within those documents.  Therefore, the Court finds that a substantial question of material fact exists with regard to whether the CMP and/or the strategic business plan constituted a commitment to maintain the capital of the bank for purposes of 11 U.S.C. § 365(o).

AFC has also argued that if any commitments was contained in the documents submitted as part of the Management Action Plan, they were terminated or modified by the OTS either by virtue of the statements made in the Bank's August 25, 2008 Report of Examination, or at the latest, when AFC and the Bank stipulated to their respective Cease and Desist Orders on

---

[18]

 In the August 25, 2008 Report of Examination, the OTS indicated that the Bank had "complied with [the business plan] requirement by submitting an acceptable business plan to OTS." (ECF #67, Ex. 20).  This could indicate that submission, itself, constituted full compliance for the Bank, although no corresponding statement could be found with regard to AFC's compliance.  Providing evidentiary support for the alternative conclusion (that satisfaction of the terms and requirements in the plan was required in order to comply with the OTS mandate), the Stipulated Cease and Desist Order between OTS and AFC stated that OTS believed the Order was necessary because of "the failure of the Holding Company to meet the specific capital enhancement and preservation requirements contained within the Holding Company's business plan."  (ECF #67, Ex. 31, pg. 2).

November 19, 2008.  In support of this position, AFC notes that the OTS declared the three year strategic business plan "obsolete" in its Report of Examination of the Bank on August 25, 2008. (ECF #66, Ex. 20).[19]  Although this is evidence that the Bank did not live up to the terms of its plan, and may be some evidence suggesting that the OTS may have abandoned its expectations for any results under the plan,[20] it does not conclusively show that the OTS acted to terminate any commitment contained therein, which is the statutory requirement for absolving AFC of any commitment made for purposes of 11U.S.C. § 365(o).  Further, this statement does not expressly apply to any alleged commitment contained in the CMP.

AFC also notes that the Cease and Desist Orders lowered the capital ratios that the Bank was expected to maintain, in effect arguing that when the OTS issued the Cease and Desist Orders, and accepted AFC's stipulation, it acted to terminate any prior commitment to maintain the capital of the bank at previously specified levels or amounts.   This argument has considerable logical appeal, however, AFC has not submitted any actual evidence that would irrefutably show that its Cease and Desist Order superceded any commitments it may have made in prior agreements.

Although the Bank was expressly released from the terms of its Memorandum of Understanding, the OTS did not expressly terminate or modify the requirements it had imposed

---

[19]

AFC also cites to an OTS internal email that stated: "We had not approved the plan they sent us."  (ECF# 78, Ex. 2).  This statement is contradicted by the language in the August 25, 2008 Report of Examination, which stated that Bank had "complied with [the business plan] requirement by submitting an *acceptable* business plan to OTS." (ECF #67, Ex. 20)(emphasis added).

[20]

 Acknowledging that a party has defaulted on an obligation does not nullify the fact that the obligation exists or that a commitment had been made.

on AFC through the June 18, 2009 Report of Examination.  On November 25, 2008, the OTS sent a notice to the Bank advising that the 2008 Memorandum of Understanding between the parties was terminated upon the issuance of the Cease and Desist Order directed at the Bank.  (ECF # 67, Ex. 33; see also ECF # 67, Ex. 56, pg. 19).  This is clear evidence that the Bank's obligations under the Memorandum of Understanding had been terminated or modified by the terms of its Cease and Desist Order.  However, no such notice or acknowledgment appears to have been issued to AFC with regard to its obligations under the June 18, 2008 Report of Examination, or any alleged commitments it made through its submission of the CMP or the three year strategic business plan.

The terms of the Cease and Desist Order, and the Stipulation and Consent also fail to clarify whether the Order was intended to terminate or modify any obligations AFC may have had under the CMP or the three year strategic business plan.  It is unclear whether the Cease and Desist Order was intended to supercede earlier obligations or whether it was meant to provide an interim structure and set of even stricter requirements that would apply only until AFC regained its "adequately capitalized" status.  The statutory structure of the banking laws allows and even mandates that the OTS take progressive steps to formally address and regulate the activities of Banks that fall below specific capital ratios.   This does not mean that once the lowest allowable ratios are reestablished, the Bank is not still subject to requirements or controls aimed at restoring more appropriate levels or at maintaining an even higher level of capitalization.[21]

---

[21]

  This would be the equivalent of a teacher or a parent taking progressively stronger actions against a student who dropped from a B average, to a C average, to a D average, and then to an F.  Once the student reestablished a D average after having fallen to an F, they would not be relieved of the obligations and responsibilities that were intended to bring them from a D back to a C, or from a C back to a B.

The language contained in AFC's Cease and Desist Order makes no reference at all to the CMP, the three year strategic business plan, or any obligations undertaken as a result of the June 18, 2008 Report of Examination.  It neither reaffirms any such obligations, nor terminates any such obligations.   The language contained in AFC's Stipulation and Consent also fails to specifically address any prior commitments or obligations arising under the documents at issue. It does, however, provide language that could possibly support either the FDIC-R's position, or AFC's position as to whether the Cease and Desist Order was meant to supercede or terminate any prior obligations under the CMP or the three year strategic business plan.

Paragraph 6 of the Stipulation and Consent specifies that "[n]othing in this Stipulation or accompanying Order shall inhibit, estop, bar or otherwise prevent OTS from taking any other action affecting the Holding Company if at any time OTS deems it appropriate to do so to fulfill the responsibilities placed upon OTS by law." (ECF # 67, Ex. 31, pg. 4).  It also states in paragraph 7 that the "Holding Company acknowledges and agrees that its consent to the issuance of the Order is solely for the purpose of addressing the matters addressed herein, consistent with Paragraph 6 above, and does not otherwise release, discharge, compromise, settle, dismiss, resolve, or in any way affect any actions, charges against, or liability of the Holding Company that arise pursuant to this action or otherwise, and that may be or have been brought by any governmental entity other than OTS." (ECF # 67, Ex. 31, pg. 4).  These provisions limit the scope of the agreement, and allow the OTS, and other federal agencies to continue to enforce matters and liabilities not directly addressed by the Stipulation and Consent.  With regard to those matters addressed in the Stipulation and Consent, however, the agreement specifically states that "the terms of this Stipulation and of the Order represent the final agreement of the

-28-

parties with respect to the subject matters thereof, and constitute the sole agreement of the parties with respect to such subject matters . . . ."  (ECF # 67, Ex. 31, pg. 5).

The matters addressed in AFC's Stipulation and Consent are the facts that the OTS believed AFC had  "engaged in unsafe and unsound banking practices, including the failure [of AFC] to meet the specific capital enhancement and preservation requirements contained within [its] business plan," and that AFC's "wholly-owned savings association subsidiary, AmTrust Bank ... operating with an unsafe level of adversely classified assets relative to existing core capital plus allowances for loan and lease losses."  (ECF # 67, Ex. 31, pg. 2).  This could be interpreted to mean that the Cease and Desist Order addresses AFC's obligations under the business plan,  or it could be read to have a more limited scope, addressing only the direct consequences of AFC's current default of its obligations under the business plan.  The former interpretation  would lead to the conclusion that prior agreements or obligations under the business plan are superceded by the Cease and Desist Order, while the later interpretation would support a finding that the Order did not supercede any on-going requirements or commitments made within that plan.  Further, it is unclear whether the "business plan" referenced in the Cease and Desist Order refers to the Management Action Plan, the CMP,  the three year strategic business plan, or any combination of those documents.  Therefore, the Court finds that the continuing validity of any alleged commitments made by AFC in the CMP or the three year strategic business plan is neither clearly established nor precluded by the terms of AFC's Stipulation and Consent or of its Cease and Desist Order.  Consequently the ongoing enforceability of those alleged commitments remains a question of fact that is disputed by the parties.

B.  Cease and Desist Order

Another commitment to maintain the capital of the Bank was allegedly made by virtue of AFC's Stipulation and Consent agreeing to the terms of a Cease & Desist Order issued by the OTS.  On or about November 19, 2008, the OTS issued separate Cease and Desist Orders to the Bank and to AFC.  (ECF # 67, Ex. 28, 30).  Both the Bank and AFC stipulated to the issuance of their respective Orders.  (ECF # 67, Ex. 29, 31).   The Bank's Cease and Desist Order required that it "have and maintain: (I) Tier 1 Capital Ratio of at least seven percent (7%) and (ii) a Total Risk-Based Capital Ratio of at least twelve percent (12%)."  These ratios were to be achieved "no later than December 31, 2008" and maintained  "at all times thereafter"  (ECF # 67, Ex. 28, ¶ 1).  AFC's Cease and Desist Order required, among other things,[22] that the Board of Directors of AFC "shall ensure that the [Bank] complies with all of the terms of its Order to Cease and Desist issued by OTS on November 19, 2008."  (ECF # 67, Ex. 30, ¶ 8).   The FDIC-R argues that this provision in AFC's Cease and Desist Order is clear and unambiguous, and that it constitutes a commitment to maintain the capital of the Bank at the ratios specified in the Bank's own Cease and Desist Order.  The FDIC-R contends that paragraph eight of the stipulated Cease and Desist Order required AFC's Board to ensure that the Bank meets its assigned capital ratios, and that paragraph four required AFC to submit a plan showing how those ratios would be met.

In support of its position, the FDIC-R cites to a wide range of cases in a variety of

---

[22]

  The Cease and Desist Order also required AFC to submit "a detailed capital plan to attain no later than December 31, 2008, and maintain at the Holding Company's wholly-owned savings association subsidiary, AmTrust Bank ... (I) Tier 1(Core) Capital Ration of at least seven percent (7%) and (ii) Total Risk-Based Capital Ratio of at least twelve percent (12%)." (ECF # 67, Ex. 30, ¶ 4).

contexts that have held the word "shall" is used to create a mandatory obligation.  *See, e.g.,* *United States v. Monsanto*, 491 U.S. 600, 607 (1989); *Societe Nationale Industrielle Aerospace v. U.S. Dist. Court for th S. Dist of Iowa*, 482 U.S. 522, 534, n. 15 (1987); *Hewitt v. Helms*, 459 U.S. 460, 471 (1983); *United States v. Young*, 424 F.3d 499, 507 (6th Cir. 2005); *Plaut v. Spendthrift Farm, Inc.*, 1 F.3d 1487, 1490, n. 4 (6th Cir. 1993), aff'd 514 U.S. 211 (1995). Further, there is little dispute that the plain meaning of the word "shall" creates a mandate or requirement.  *See*, *e.g.*,  Merriam-Webster's Collegiate Dictionary 1143 (17th ed. 2008).

The FDIC-R also cites several cases, stemming from a variety of circumstances, that have held the word "ensure," especially when coupled with the predicate "shall" creates a mandatory obligation.  *See, e.g., Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 590-91 (1998); *Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 858 (D.C. Cir. 2006); *American Fed'n of Gov't Employees, AFL-CIO v. Gates,* 486 F.3d 1316, 1336 (D.C. Cir. 2007); *United States v. Lincoln*, 277 F.3d 1112, 1113-14 (9th Cir. 2002); *United States v. Degenhardt*, 405 F. Supp.2d 1341, 1349 (D. Utah 2005).  Therefore, the FDIC-R argues that the plain language in AFC's Cease and Desist Order creates a mandatory obligation making AFC responsible for the Bank's achievement of the capital level ratios set forth in the Bank's own Cease and Desist Order.

In further support of this position, the FDIC-R argues that AFC's Cease and Desist Order was issued as a condition of keeping the Bank out of receivership.  The parties agree that absent AFC's stipulation to abide by the terms of the Cease and Desist Order, the OTS would have been within its rights to place the Bank in receivership.  (ECF #40, pg. 7).  As shown by the many discussions at AFC Board meetings,  AFC clearly had a serious interest in keeping the

Bank out of receivership, and thought that it would benefit by entering into the Stipulation and Consent and by agreeing to the requirements set forth therein. (See Minutes of AFC Board Meetings, ECF #67).   Further, the FDIC-R has provided evidence that AFC was the only party that could raise capital for AmTrust Bank, thereby improving the Bank's capital ratios.  (ECF # 77, Ex. G-I).   The FDIC can, therefore, argue that the only way to truly ensure the Bank's achievement of the required capital rations  would be for AFC to provide capital that could not otherwise be raised or obtained by the banks own efforts.  Thus, in order for the Cease and Desist Orders to have any real effect, the OTS had to require a commitment from AFC, and not just the Bank, if it really intended to have the Bank return to a safe level of capitalization.  This interpretation of the circumstances surrounding the creation of AFC's Cease and Desist Order, and of the meaning and intent of that Order is wholly consistent with the language employed within the Cease and Desist, and the Stipulation and Consent entered into by AFC.  However, it is not necessarily the only reasonable interpretation that can be drawn .

AFC argues that the term "ensure" does not create a mandatory obligation, but rather indicates an internal policy goal.  In support of this contention, it points to the use of the word "ensure" in OTS's Budget and Performance Plan, and in the FDIC's own 2009 Annual Performance Plan. [23] AFC in essence argues that because the word "ensure" was used in these

---

[23]

  This argument relies on extrinsic evidence in an attempt to prove the meaning of the terms of the Cease and Desist Order.  Generally type of extrinsic information would not be properly considered unless and until the Court had determined that the terminology in the Cease and Desist Order is ambiguous.   In this instance, however, the Court has addressed the argument before determining the issue of ambiguity because the banking field is riddled with language that holds special meaning within the industry, and evidence of the use of language as a term of art, can be considered in the original determination of whether an agreement is ambiguous or unambiguous.

contexts without creating any legal commitment of financial resources, it could not possible be construed as creating a commitment when used in AFC's Cease and Desist Order.  This argument is unconvincing.  Comparing the use of the word "ensure" in internal performance plans to its use in a Cease and Desist Order requiring the action of a third party is like comparing apples and oranges.  The use of the word "ensure" does not create a commitment in an internal policy because the promise to "ensure" certain financial goals is not made to anyone outside the company.  If the OTS stated that it would ensure some financial goal in its own internal performance policy, there is no commitment to a third party. Therefore, even if it was intended to be a commitment, that obligation is unenforceable or illusory, because there is no one with standing to enforce it.  Similarly, if the FDIC makes a statement that it will "ensure that a bank's capital is adequate to weather the stresses of a more difficult financial environment," in its own internal performance policy, it is not making a commitment to a third party, and any obligation it may create is also unenforceable because there is no one with standing to enforce it.[24]  If AFC had only promised itself, through some internal policy,  that it would ensure the bank's performance, that promise or commitment would not be enforceable under 11 U.S.C. § 365(o).[25]  However, 11 U.S.C. § 365(o) specifically gives the FDIC-R

---

[24]

 Certainly, however, if employees of either of these entities were responsible for a failure to obtain the goals these policies sought to ensure, they could potentially face internal consequences for that failure.

[25]

 In fact there are several places within the Management Action Plan, and even the CMP where the word "ensure" is clearly used to describe an internal goal or objective of AFC. The FDIC-R does not allege that a commitment to the OTS was made each time the word "ensure" is used.  There is a clear differentiation between the legal and practical consequences associated with a stated "goal, " "objective," or "plan" to "ensure" that something happens, and a commitment or binding agreement, made to a third party, to "ensure" that something happens.

standing to enforce a commitment that AFC makes to the OTS to maintain the capital of the Bank. There is no question that the Cease and Desist Order was not an internal policy, or that AFC made an enforceable commitment to the OTS when it entered into the Stipulation and Consent to abide by the terms of its Cease and Desist Order. The only question is whether the commitment to ensure that the Bank meets certain ratios equates to a "commitment to maintain the capital" of the Bank.

AFC also contends that because paragraph eight was directed at the Board and did not specifically name AFC (the holding company), it cannot be construed as a performance obligation of the company. AFC argues that when an obligation is directed at the Board, it must only refer to oversight functions. AFC's Cease and Desist Order sets forth obligations specifically assigned to the "Holding Company," in paragraphs 1-3, 4(a), and 5-7. In paragraph eight, and paragraph 4, subsection (b), the Cease and Desist Order requires "the Board" to perform some obligation. AFC argues that this is a clear indication that it is only accountable for actual performance obligations when the "Holding Company" is referenced, and that the requirements assigned to the Board are merely oversight functions, and not requirements of the company. There is no language in the Cease and Desist Order that directly supports this interpretation. Paragraph 4(b) requires the Board to "monitor and review the sufficiency of the Association's capital position in relation to the Association's risk profile on a quarterly basis." The plain language of this subsection makes clear that it involves an oversight function assigned to the Board, and by its own terms does not impose any requirement to achieve a specific performance goal. The language in paragraph eight does not so clearly restrict the Board's obligations to the mere oversight of Bank's position. Rather the language in paragraph eight

specifically states that the Board "shall ensure" that the Bank achieves the obligations set forth in its own Cease and Desist Order.

Although AFC argues that if the Court does not view the requirements specifically directed at the "Board" as addressing only oversight functions, the apparently intentional distinction made between "the Holding Company" and "the Board"  would be mere surplusage, and that this result would run contrary to established contract law.  However, it could just as easily be argued that if the Court interpreted paragraph eight as directive to provide oversight to the bank with regard to its capital ratios, that paragraph would be mere surplusage because paragraph 4(b) already requires the Board to provide oversight and monitoring of the Bank's capital positions.

AFC admits that under federal and Ohio law a corporation cannot act except through the actions of its Board, and there is no legal distinction between a corporation and the board of a corporation.  *See In Re Cardinal Health, Inc.  ERISA Litig.*, 424 F. Supp. 2d 1002, 1050 (S.D. Ohio 2006); *United Tel. Credit Union v. Roberts*, 875 N.E.2d 927, 930 (Ohio 2007); *Flarey v. Youngstown Osteopathic Hosp.*, 783 N.E.2d 582, 584 (Ohio Ct. App. 2002).  Further, AFC does not dispute that paragraph eight imposes an obligation on AFC and not just its Board members. Therefore, the Court cannot say, that paragraph eight unambiguously fails to establish a commitment by AFC to maintain the capital of the Bank, merely because the alleged commitment was made on behalf of the Board and was not expressly directed at "the Holding Company."

AFC further argues that even if the Cease and Desist Order did originally create a commitment to maintain the capital of the Bank, it was excused from any commitment that may

have existed in the Cease and Desist Order when the OTS accepted the Risk Reduction Plan

submitted jointly by AFC and the Bank.    The Cease and Desist Order provided that its terms

would remain in effect until "terminated, modified, or suspended in writing by the OTS.  (ECF

#67, Ex. 29, ¶8(f)).  The OTS did approve the Risk Reduction Plan in writing by virtue of a

letter dated February 20, 2009, and the Risk Reduction Plan specified that it was premised on

the assumption that "no further capital contributions will be received from the holding company

or outside sources," (ECF # 67, Ex. 45, pg. 18).   However, the OTS's  approval of the Risk

Reduction Plan  was specifically conditioned on the Bank's ability to successfully execute their

proposed plan.  (ECF #67, Ex. 49).  There is no question that the Bank did not successfully

execute its plan, and that its financial condition materially declined beyond the limits projected

in the plan. Therefore, the terms of the Risk Reduction Plan did not modify or terminate the

requirements in the Cease and Desist Orders because the conditions under which the OTS

agreed to accept the Plan  were never satisfied.[26]

---

[26]

  This same reasoning applies to override AFC's argument that even if a commitment was
made, the ratios required of the Bank were reduced by virtue of the lower ratios set forth
in the Risk Reduction Plan.  In response to paragraph four of the Cease and Desist Orders,
the Bank and AFC jointly developed and submitted a risk reduction plan to the OTS.
(ECF # 67, EX. 45).  That plan  reduced the Bank's capital ratio requirements to four
percent for Tier 1 Core, and eight percent for Total Risk-Based capital ratios.  By the
terms of the Cease and Desist Order, the original seven and twelve percent ratios remained
in effect until "terminated, modified, or suspended in writing by the OTS.  (ECF #67, Ex.
29, ¶8(f)).  AFC argues that the required seven and twelve percent ratios were altered by
the OTS's acceptance of the Bank's and AFC's collective Risk Reduction Plan.  As stated
above, the OTS did approve the lower ratios contained in the Risk Reduction Plan in
writing by virtue of a letter dated February 20, 2009, however, that approval was
specifically conditioned on the Bank's ability to successfully execute their proposed plan.
(ECF #67, Ex. 49).  The OTS's conditional acceptance of this plan did not, in fact,
override or modify the terms of the Cease and Desist Orders because the Bank did not
meet the conditions required for the OTS's approval of the proposed modification.

Based on the arguments of the parties, and having reviewed all of the language contained in AFC's Cease and Desist Order and Stipulation and Consent, the Court finds that the meaning of the language contained therein could be susceptible of more than one reasonable interpretation.

AFC's remaining arguments address the parties' intent with regard to the creation of a commitment by AFC to maintain the capital of the Bank.  AFC provides extrinsic evidence that allegedly proves AFC did not, or could not have intended to make a commitment to OTS to maintain the capital of the Bank.  However, this evidence is not conclusive.  The FDIC has also presented evidence supporting its contention that a commitment was made, and has presented arguments showing that the language of the documents at issue contradicts some of the testimony and arguments put forth by AFC.  As there is clearly a material dispute as to the meaning and enforceability of the three statements alleged to have created a commitment to maintain the capital of the bank for purposes of 11 U.S.C. § 365(o), and as both sides have submitted evidence and argument that would reasonably support their own positions on this matter, the Court finds that neither party is entitled to judgment as a matter of law under the summary judgment standard.  Therefore, a full trial is warranted on these issues.


C. Equitable Estoppel

AFC argues that even if it did make a commitment to maintain the capital of AmTrust Bank, the FDIC-R should be barred from enforcing the commitment by the doctrine of equitable estoppel.  AFC contends that because OTS took no action against AFC in connection with the alleged capital maintenance commitment, and because the FDIC did not notify AFC of its intent

to recover the deficit remaining under the alleged capital maintenance commitment before AFC filed for bankruptcy, the FDIC-R should be barred from seeking any recovery based on the alleged commitment.

This argument fails for several reasons.  First the FDIC, in its capacity as Receiver of AmTrust Bank, cannot be estopped based on the conduct or the inaction of the FDIC Corporation or the OTS.  As a matter of law, a party cannot be equitably estopped based on the conduct of a third party.  The FDIC in its capacity as Receiver is a separate and distinct entity from the FDIC Corporation and from the OTS.  *See generally Fed. Sav. & Loan Ins. Corp. v. Burdette*, 696 F.Supp. 1183, 1188 (E.D. Tenn. 1988); *FDIC v. White*, 828 F.Supp. 304, 311 (D.N.J. 1993).

Further, the law of estoppel as it applies to the FDIC, as a government agency, requires a showing of affirmative misconduct, and is not an available defense based on a failure to notify or otherwise take proactive steps to inform or warn anyone of  its intent to enforce its legal authority or obligations.  *See, e.g.,  Premo v. United States*, 599 F.3d 540, 547 (6th Cir. 2010); *Michigan Express, Inc. v. United States*, 374 F.3d 424, 427-28 (6th Cir. 2004).  No affirmative misconduct by the FDIC or the FDIC-R has been alleged.  It is irrelevant to the enforcement of the statute whether the OTS or the FDIC Corporation ever had any actual intent of enforcing[27] the alleged commitment prior to AFC's filing for bankruptcy.  Unless the OTS terminated,

---

[27]

  The OTS's intent to enforce the alleged commitment can be distinguished from the parties' intent to create or enter into such a commitment.   Parties, not infrequently, may enter into binding agreements, which when breached are not enforced.  The "injured" party may have a variety of business or personal reasons not to enforce a contract or other commitment.  A decision not to enforce a right, however,  does not render the right unenforceable.

modified, or suspended the alleged commitment in writing, it was fully enforceable by the

FDIC-R once AFC filed for bankruptcy.  11 U.S.C. § 365(o).  Further, as a matter of general

common sense, the FDIC-R simply cannot be held to a duty, legally or equitably, to inform AFC

of its intent to enforce a bankruptcy statute before AFC ever even filed for bankruptcy. [28]  For

these reasons, AFC's defense of equitable estoppel fails as a matter of law.

---

[28]

  This argument is even less credible because AFC filed for bankruptcy before the Bank
was put into receivership, and the FDIC-R was appointed.  AFC filed a petition for
Chapter 11 reorganization on November 30, 2009, and the FDIC-R was appointed
following the closing of the Bank on December 4, 2009.  (ECF # 67, pg. 16).

-39-

## CONCLUSION

The Court finds that there is a question of material fact with regard to whether the CMP and/or the three year strategic business plan submitted jointly by AFC and the Bank contained a commitment by AFC to maintain the capital of the Bank.  Further, there is a question of fact as to whether the issuance of AFC's Cease and Desist Order of November 19, 2008, and/or AFC's Stipulation and Consent to the Cease and Desist Order, constituted an act by OTS that terminated any prior commitment by AFC to maintain the capital of the Bank.

The Court also finds that AFC's Cease and Desist Order and accompanying Stipulation and Consent are ambiguous with regard whether they included a commitment by AFC to maintain the capital of the Bank.   In addition, there is evidence to support the positions of both AFC and the FDIC-R, therefore, a trial is necessary to make a determination as to whether AFC made a commitment to maintain the capital of the Bank for purposes of 11 U.S.C. § 365(o). Further, if a commitment was made by virtue of any of these document, there also remains a question of fact as to what deficit remains under the alleged commitment(s).

Therefore, the Motion of the Federal Deposit Insurance Corporation for Partial Summary Judgment Against AmTrust Financial Corporation (ECF #27), and the Debtor's Motion for Summary Judgment on Capital Commitment Claim (ECF #25) are both DENIED.  Trial is set for April 18, 2011 at 8:30 a.m..   IT IS SO ORDERED.


   /s/ Donald C. Nugent
DONALD C. NUGENT
United States District Judge


DATED:   January 31, 2011