IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORP., | ) | CASE NO.  1:10 CV 1298 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| AMFIN FINANCIAL CORPORATION, | ) | <u>MEMORANDUM OPINION</u> |
| | ) | |
| Defendant. | ) | |

This matter is before the Court subsequent to a four-day trial to the Court, with an advisory jury, pursuant to Fed. R. Civ. Pro. 38(c)(1).  The Plaintiffs called five witnesses: Christopher Brauser, Joe Campanella, Daniel McKee, James Meyer, and David VanVickle. The Defendants did not call any witnesses.  Both sides submitted exhibits.  Following trial, the parties were given the opportunity to submit proposed findings of fact and conclusions of law. The issues have now been fully presented.

<u>**PROCEDURAL HISTORY**</u>

AmTrust Financial Corporation ("AFC") (now know as AmFin Financial Corporation), is a "savings and loan holding company" for the "savings association," AmTrust Bank ("the

Bank").  The Office of Thrift Supervision ("OTS") is a federal regulatory agency that has the authority to regulate and examine the financial affairs of savings associations and of holding companies.  12 U.S.C. §§ 1811 *et seq.*; 12 U.S.C. §§ 1461 *et seq.*.

On November 30, 2009, AFC  filed a voluntary petition for relief under Title 11 of the Bankruptcy Code. The OTS closed AmTrust Bank four days later, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver of the Bank.  The FDIC, as receiver, took over all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, account holder, depositor, officer, or director of the Bank, and has the power to liquidate and "proceed to realize upon its assets." 12 U.S.C. § 1821(d)(2)(A)(I); 12 U.S.C. § 1821(d)(2)(E).

In accordance with these rights, the FDIC seeks to recover monies allegedly owed by AFC as a result of alleged commitments the FDIC claims AFC made to the OTS to maintain the capital of the Bank.   To this end, the FDIC filed a motion in the Bankruptcy Court for an order, pursuant to 11 U.S.C. § 365(o), to require AFC to immediately cure the deficits under the alleged capital maintenance commitments.  ("Motion to Cure") (Case No. 09-21323, Docket No. 371).

The FDIC moved this Court to withdraw this issue from the bankruptcy reference, pursuant to 28 U.S.C. § 157(d).  (ECF #1).  The Court granted that motion and ordered the withdrawal of the bankruptcy reference with respect to all proceedings related to the FDIC's motion to require AFC to immediately cure any claimed deficit under its alleged commitments to maintain the capital of AmTrust Bank.  The Court further ordered a stay of the bankruptcy proceedings pending resolution of this matter. (ECF #5).

Both parties sought summary judgment in their favor on these issues.  In reviewing those

motions, this Court found that there was a genuine issue of material fact with regard to whether the Capital Management Policy and/or the three-year strategic business plan submitted jointly by AFC and the Bank contained a commitment by AFC to maintain the capital of the Bank. Further, the Court found that AFC's Stipulation and Consent to the Cease and Desist Order, issued by the OTS on November 19, 2008, was ambiguous with regard to whether it included a commitment by AFC to maintain the capital of the Bank. In addition, if there was any commitment made, the Court found that there was a question of fact as to whether the OTS's conduct terminated any of the alleged commitments by AFC to maintain the capital of the Bank.

        Even at the summary judgment stage, the evidence strongly favored a resolution in favor of AFC. The FDIC sought summary judgment on the premise that the language of the alleged commitments was unambiguous, and that it clearly created a commitment by AFC to maintain the capital of the Bank. The Court easily found that this was not the case. AFC also made an argument that the language of the alleged commitments was unambiguous, but conversely, argued that the language, taken in context, unambiguously failed to create any commitment. The Court also found that this was not the case. The terminology used, and the context in which it was used, both led to a determination that the language of the documents containing the alleged commitments was ambiguous when considered as a whole.

        AFC's main argument, however, was that even if the language of the documents was ambiguous, the extrinsic evidence clearly established that the OTS never intended to impose an obligation on AFC to maintain the capital of the Bank, and that AFC never intended to create or agree to any such commitment. The evidence presented at the summary judgment stage

weighed overwhelmingly in favor of AFC's position on this issue.    Nonetheless, although, the

FDIC had not submitted any convincing evidence to contradict AFC's interpretation of the true

meaning of language setting forth the alleged commitments at issue, the Court found that there

were some theories upon which the FDIC could argue against that interpretation.  Therefore,

giving all possible benefit to the FDIC at that stage of the proceedings, the Court allowed the

case to move forward to trial.

Trial of this matter commenced on April 18, 2011, before an advisory jury, pursuant to

Fed. R. Civ. Pro. 39(c)(1).  On April 22, 2011, following four days of trial, the jury answered

"no" to the following interrogatory:

### Interrogatory No.1

Do you find that the FDIC has proven by a preponderance of the evidence that by
agreeing to the AFC cease and desist order on or about November 19, 2008, AFC
made an enforceable commitment to the OTS to maintain the capital of AmTrust
Bank?

After the advisory jury returned this finding, the parties were given a final opportunity to present

their proposed findings of fact and conclusions of law.  The Court is not bound by the advisory

jury's determination, but finds that it comports fully with the weight of the evidence presented at

trial.

### ANALYSIS

1. <u>Applicable law</u>

The question  at issue in this case is whether AFC faces a "deficit under any commitment

... to a Federal depository institutions [sic] regulatory agency . . . to maintain the capital of"

AmTrust Bank, as contemplated by 11 U.S.C. § 365(o).  Section 365(o) provides as follows:

In a case under chapter 11 of this title, the trustee shall be deemed to have

> assumed (consistent with the debtor's other obligations under section 507), and
> shall immediately cure any deficit under, any commitment by the debtor to a
> Federal depositary institutions [sic] regulatory agency (or predecessor to such
> agency) to maintain the capital of an insured depository institution, and any claim
> for a subsequent breach of the obligations thereunder shall be entitled to priority
> under 507.  This subsection shall not extend any commitment that would
> otherwise be terminated by any act of such an agency.

11 U.S.C. §365 (o).

Title 11 does not specify any particular form that a "commitment to maintain the capital of an insured depository institution" must take, or otherwise provide any guidance as to how to determine whether such a commitment has been made.  According to the legislative history of the statute, Congress enacted Section 365(o) "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."  H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990), reprinted in 1990 U.S.S.C.A.N. 6472, 6585.

In this case, the FDIC contends that AFC should be deemed to have "committed to maintain the capital of AmTrust Bank," for purposes of § 365(o), by virtue of (1) the Capital Management Policy AFC submitted to the OTS on July 30, 2008 and/or the three-year strategic business plan, submitted to the OTS on August 8, 2008; and, (2) AFC's Stipulation and Consent to the formal Cease and Desist Order issued by the OTS on or about  November 19, 2008.  AFC contends that none of these documents contain a commitment to maintain the capital of AmTrust Bank.

2. <u>Stipulated Facts</u>[1]

Pursuant to the Financial Institutions Reform Recovery, and Enforcement Act of 1989, the OTS is the primary regulator of savings associations and their holding companies.  As such, OTS  has the authority to enforce various provisions of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811, *et seq*. and the Home Owner's Loan Act, 12 U.S.C. §§ 1461, *et seq*., against those savings associations and holding companies.   This includes the power to conduct examinations of savings associations and holding companies, pursuant to 12 U.S.C. §§  1464(d)(1)(B)(I), 1464(d)(6), and 1467a(b)(4), and 12 C.F.R. § 563.170.  The OTS also has the authority to issue Cease and Desist Orders to savings associations and holding companies pursuant to 12 U.S.C. § 1818(b)(1) and (3).  This authority allows the OTS, among other things, to require an institution to cease and desist from unsafe or unsound practices, and to require an institution to "take affirmative action to correct the conditions resulting from any such violation or practice."  12 U.S.C. § 1818(b)(1). A cease and desist order issued pursuant to 12 U.S.C. § 1818(b) shall remain "effective and enforceable" as provided therein, except to such extent as it is stayed, modified, terminated, or set aside by action of the agency or a reviewing court. 12 U.S.C. § 1818 (b)(2).

AFC was a "savings and loan company" within the meaning of 12 U.S.C. § 1813(w)(3) and 12 U.S.C. § 1467a(a)(1)(D), and was, therefore, subject to regulation by the OTS.  AmTrust Bank was a "savings association" within the meaning of 12 U.S.C. § 1813(b) and 12 U.S.C.

---

[1] The stipulated facts were taken from the *Stipulation Between the Federal Deposit Insurance Corporation And AmTrust Financial Corporation Involving Documents And Uncontested Facts Related to the Court's Consideration of The Capital Maintenance Proceeding* (ECF #67), which was filed in connection with the Cross-Motions for Summary Judgment.

§ 1462(4), and was also subject to regulation by the OTS.  AmTrust Bank was also an "insured depository institution" within the meaning of 12 U.S.C. § 1813(c), meaning that the FDIC insured the deposits at this savings bank.  AFC is an "institution affiliated party" of AmTrust Bank within the meaning of 12 U.S.C. § 1813 (u)(1).

On or about June 18, 2008, the OTS sent, and AFC received, a copy of a Report of Examination outlining the findings OTS made during a risk-focused examination of AFC conducted on or about November 30, 2007, pursuant to its authority under 12 U.S.C. § 1464 (d)(1)(B)(I) and 12 U.S.C. § 1467a(b)(4).  The report outlined the current "risk and complexity" of AFC's structure, and required that the Board of AFC provide the OTS "with a business plan that provides for reduction of risk and enhancement of capital for the consolidated company." (ECF #67, Ex. 5).  On or about July 10, 2008, the Bank entered into a Memorandum of Understanding with OTS agreeing in part to develop and submit a strategic business plan ensuring the incorporation of detailed capital preservation and enhancement strategies.  (ECF #67, Ex. 10).[2]

In response to the OTS requirements,[3] AFC and the Bank jointly submitted a Management Action Plan that included a Capital Management Policy ("CMP") approved by

---

[2]AFC was not a party to the Memorandum of Understanding.

[3] Although AFC argues that it was not required to submit the CMP, the stipulated documents provide evidence that the submission was part of a broader Management Action Plan that was submitted to the OTS, at least in part in "response[] to issues and requirements identified ... as Matters Requiring Board Attention in [the OTS's Report of Examination] of AmTrust Financial Corporation ..."  transmitted on June 18, 2008.  (ECF # 67, Ex. 13).  The Report of Examination specifically required AFC to "provide OTS with a business plan that provides for reduction of risk and enhancement of capital for the consolidated company."  (ECF # 67, Ex. 5, pg. 3).

-7-

AFC's Board of Directors.  (ECF #67, Ex. 13).  The purpose of the CMP  was to "establish a framework for planning and managing capital adequacy on an enterprise-wide basis for [AFC] and [the Bank].  (ECF #67, Ex. 14).  The CMP set forth objectives, goals, assessment policies, assessment measures, and limits and targets for AFC and the Bank's collective capital position. (ECF #67, Ex. 13, 14).  Under the section captioned "Capital Adequacy Objective,"the policy established limits for maintaining  the collective capital positions of AFC and the Bank.   These limits were defined as "absolute minimums and maximums that are not to be breached." [4]  (ECF #67, Ex. 13, 14)  The defined limits were as follows:

- Tier 1 leverage/Tangible equity to assets of 7 percent.
- Tier I risk based capital to risk weighted assets of 10.5 percent
- Total risk based capital to risk weighted assets of 11.5 percent
- Dividend Payout Ratio (per dividend guidance in this Policy)

(ECF #67, Ex. 13, 14).  The targets were set at higher percentages.

Also in response to the OTS requirements, the Bank submitted to the OTS, on behalf of "AmTrust Bank & Subsidiaries," [5]  a three-year strategic business plan that indicated AFC was "in process of raising $475 million (after transaction costs) of new capital" and called for

---

[4]

 The policy went on to state that "[i]n the unusual event [that the limits are breached], contingency plans must be implemented within thirty (30) days to restore capital and/or capital ratios back to levels that comply with the limits."  (ECF #67, Ex. 14).

[5]

 AFC is a subsidiary of the Bank.  The minutes of the Joint Board of Directors meeting of AFC and the Bank on July 30, 2008, indicate that AFC's Board adopted and approved the Management Action Plan and the letter to the OTS dated July 20, 2008, and resolved that "any actions taken, amounts expended, documents signed or delivered or commitments undertaken on behalf of AFC or the Bank with respect to the subject matter of the [Management Action Plan and the letter dated July 20, 2008] or any portion thereof are ratified, confirmed and approved."  (ECF #67, Ex. 11, pg. 5).

"capital infusions from the holding company to AmTrust Bank ("Bank") that are sufficient to achieve our problem asset reduction strategies, absorb accompanying losses, provide appropriate reserves, and improve the Bank's capital ratios from their current levels."  (ECF #67, Ex. 15, pg. 1).  Under the heading "Major Planning Assumptions," and the sub-heading "Capital," the plan went on to state that AFC "plans to raise approximately $500 million in capital through the issuance of common or convertible preferred stock.  Proceeds of the offering, net of issuance costs, are expected to total $475 million. [AFC] will contribute approximately $240 million of proceeds from the offering to Bank capital by September 30, 2008 and an additional $60 million in March 2009 . . . ."  (ECF #67, Ex. 15, pg. 4).   The expected capital infusions of $240 million and $60 million from AFC to the Bank are referenced again in the final paragraph of this same section.[6]

On or about September 30, 2008, the OTS sent, and the Bank received, a Report of Examination conducted beginning on August 25, 2008.  The Examination Conclusions and Comments noted that management for the Bank submitted an acceptable business plan to OTS in response to a Memorandum of Understanding that was entered into as a result of the July 15, 2008 examination report.  However, OTS stated that "[t]he plan assumed that the [B]ank would receive a substantial capital infusion by September 30, 2008, which did not occur, therefore, the business plan is obsolete."   The report also notified the Bank that its Composite rating had been downgraded, that the Bank was operating in an "unsound and unsafe" condition, and that it was deemed to be in "Troubled Condition" as defined by 12 C.F.R. § 563.555.  (ECF #67, Ex. 20).

---

[6]

"In addition, a $240 million capital infusion will be provided by [AFC] in September 2008 and an additional $60 million in March 2009."  (ECF #67, Ex. 15, pg. 5).

Based on the examination of the Bank and its designation as troubled, AFC was also notified that its own composite rating was being downgraded, and that the OTS also considered it to be in "Troubled Condition" as defined by 12 C.F.R. § 563.555.  (ECF #67, Ex. 21).

Subsequently, on or about November 19, 2008, the OTS issued separate Cease and Desist Orders to the Bank, and to AFC.  (ECF #67, Ex. 28, 30).  Both the Bank and AFC entered into a *Stipulation and Consent to Issuance of Order to Cease and Desist* ("Stipulation and Consent") for their respective Cease and Desist Orders.  (ECF #67, Ex. 29, 31).  Both Cease and Desist Orders were premised, at least in part, on the failure of the Bank and of AFC to "meet the specific capital enhancement and preservation requirements contained within [their] business plan. . . ."  (ECF #29, ¶ 2; ECF #31, ¶ 2).

The Bank's stipulated Cease and Desist Order required, among other things, that the Bank "have and maintain: (I) Tier 1 (Core) Capital Ratio of at least seven percent (7%) and (ii) a Total Risk-Based Capital Ratio of at least twelve percent (12%)."  These ratios were ordered to be obtained "by no later than December 31, 2008" and maintained "at all times thereafter." (ECF #67, Ex. 28, ¶1).  The Bank's Stipulation and Consent specified that "[t]he terms of this Stipulation and of the Order represent the final agreement of the parties with respect to the subject matters thereof, and constitute the sole agreement of the parties with respect to such subject matter." (ECF #67, Ex. 29, ¶8(e)).  By its terms, the Order remains in effect until "terminated, modified, or suspended in writing by the OTS. . . ."  (ECF #67, Ex. 29, ¶8(f)).  On November 25, 2008, the OTS sent a notice to the Bank advising it that the previous Memorandum of Understanding between the parties (effective July 15, 2008) was terminated on November 19, 2008 upon the issuance of the Bank's Cease and Desist Order.  (ECF #67, Ex. 33;

-10-

*see also* Ex. 56, pg. 19).

AFC's stipulated Cease and Desist Order required the "Holding Company" to submit for approval "a detailed capital plan to attain no later than December 31, 2008 and maintain at the Holding Company's wholly-owned savings association subsidiary, AmTrust Bank . . . (I) Tier 1 (Core) Capital Ratio of at least seven percent (7%) and (ii) Total Risk-Based Capital Ratio of at least twelve percent (12%)." (ECF #67, Ex. 30, ¶ 4).  It also required the Board of Directors of AFC to "ensure that [the Bank] complies with all of the terms of its Order to Cease and Desist issued by OTS on November 19, 2008."  (ECF #67, Ex. 30, ¶ 8).  AFC's Stipulation and Consent specified that "[t]he terms of this Stipulation and of the Order represent the final agreement of the parties with respect to the subject matters thereof, and constitute the sole agreement of the parties with respect to such subject matter." (ECF #67, Ex. 31, ¶8(e)).  By its terms, this Order also remains in effect until "terminated, modified, or suspended in writing by the OTS. . . ." (ECF #67, Ex. 31, ¶8(f)).

The Bank did not meet the capital ratio requirements set forth in its Cease and Desist Order by the deadline of December 31, 2008.  (ECF #67, Ex. 56, pg. 60).  In January of 2009,[7] the Bank submitted a Risk Reduction Plan to the OTS for approval.  The plan did not include a means to achieve the 7% and 12% ratios mandated by the Cease and Desist Order, but instead offered to maintain Tier 1 Core and Total Risk-Based capital ratios about 4% and 8% respectively.  (ECF #67, Ex. 44, 45).   On February 20, 2009, following a review of the submitted plan, OTS approved the reduced parameters of the plan subject to several oversight

---

[7]    The plan was originally due sooner, but the Bank obtained an extension until January 5, 2009, for the filing of the plan.  (ECF #67, Ex. 47).

conditions.  In its acceptance of the plan, the OTS did specifically state, however, that its "non-objection for AmTrust Bank to operate under the plan continues for so long as the execution of the plan is successful in meeting its principal objectives and there is no material decline in the financial condition of AmTrust Bank beyond that which is projected in the plan."  (ECF #67, Ex. 49).

On November 4, 2009, the OTS notified the Bank that it had become "Significantly Undercapitalized" and subject to "Prompt Corrective Action" ("PCA") within the meaning of 12 U.S.C. § 1831o(b) and 12 C.F.R. § 565.4(b).  (ECF #67, Ex. 77).  The Bank's Total Risk-Based Capital Ratio was found to be 5.29%, with a Tier 1 Risk-Based Capital Ratio of 4.00%.  (ECF #67, Ex. 77).  As a result, the Bank was required, under 12 C.F.R. § 565.3(b),  to submit a capital restoration plan or plan amendment to OTS within 45 days of receiving the notice. The plan was to provide a means by which the Bank could return to the adequately capitalized ratio levels set forth in the previously approved Risk Reduction Plan.  (ECF #67, Ex. 77, Attach. A).  The OTS also advised the Bank that it could not accept a PCA capital restoration plan unless each company that directly or indirectly controls the Bank "guarantees that the [Bank] will comply with its plan until it is adequately capitalized for four consecutive quarters, and ... provides appropriate assurances of performance."  (ECF #67, Ex. 77, Attach. A).  This would have required that AFC sign the PCA Standard Form of Guarantee and Assurances, which included, among other things, a commitment that AFC "utilize its available assets, when directed to do so by OTS, to enable the Bank to implement its capital restoration plan,".[8]  (ECF #67, Ex. 77,

---

[8]

The guarantee was subject to the limitations contained in 12 U.S. C. § 1818(b)(1), (9).  For purposes of this guarantee, "available assets" did not include shares of the Bank held by the Holding Company or of any intermediate holding company of the Bank held by the

-12-

Attach. C).   The Bank never filed the PCA capital restoration plan, and AFC never executed the standard Form of Guarantee and Assurances.

3.  Evidence at Trial

In order to fully understand the meaning and intent of the various notices, proceedings, and orders set forth above, it is necessary to understand the general economic climate and the difficulties facing banks and their holding companies during the relevant time periods.  Taking into consideration all of the economic realities of this period, the overall climate was both unique and profound in its effect on the American banking system and the government's attempts to regulate it.

Holding companies are entities that though highly regulated under the banking statutes, and subject to strict requirements that govern their relationship with federally insured banking institutions, are independent of the banks that they own.   There is no legal requirement, under the general banking regulations,  that a holding company commit to maintain the capital of a bank; that it guarantee the performance of a bank; or,  that it infuse its own capital into a failing bank, whether or not the holding company or the bank may be facing a potential bankruptcy.

AmTrust Bank was a savings bank, which was primarily in the business of residential real estate lending.  (ECF #132 at 216 - Campanella).   AFC was the holding company for this Bank, and the Bank constituted between 90 and 98% of the total assets of the holding company.  (ECF #132 at 216-17 – Campanella).  The primary activity of the holding company was the ownership and management of the Bank.  (ECF #132 at 238 – Campanella).  Therefore, the Bank

_____

Holding Company.  (ECF #67, Ex. 77, Attach. C).

was a very important asset of the holding company, and it could be inferred that the viability of the holding company was dependent on the Bank's success.

In 2007-2008, when the Bank's ratings started to deteriorate, it was not due to a loss of money, but rather a deterioration in the loan portfolios held by the Bank.  (ECF #132 at 253 – Campanella).  Because the Bank was centered around residential real estate loans, and because of the sudden drop in evaluations for residential real estate loans, there was an unprecedented increase in delinquencies and foreclosures that negatively affected the Bank's capital ratios. (ECF #132 at 254-55 – Campanella).   During this time period, the entire country was in an economic crisis that was compounded by the problems on Wall Street, the mortgage crisis, and an overall decrease in property and housing values.  (ECF #132 at 254-55 –  Campanella). There is no evidence that the Bank or AFC  was at fault for the deterioration in the Bank's loan portfolios; there is no evidence that they could have foreseen the problems that stemmed from the change in the economic environment during this time period; and, there is no evidence that there was anything they could have done differently in order to save the Bank or prevent AFC's bankruptcy once the problems arose.

Further, because of the dramatic change in the mortgage loan industry, the regulators increased the ratios required of the Bank to higher than the normally accepted levels in order to ensure the stability of the Bank in this increasingly risky industry.  (ECF #132 at 256-57 – Campanella; ECF #132 at  442 – McKee).  In the summer of 2008, although the Bank was still categorized as "well-capitalized," OTS was concerned, based on the economic trends, that there would be further deterioration in the loan portfolios.  (ECF #132 at 268-69 – Campanella).  This was when the OTS asked the Bank to submit a Capital Management Policy.  When the OTS

asked the Bank to devise a plan to increase their capital ratios, the Bank was very optimistic about its ability raise additional capital from Wall Street.  (ECF #132 at 253, 386 – Campanella). AFC worked with OTS and hired a third-party suggested by OTS to help with assessment of the Bank's capital needs and capital raising strategies and alternatives.  (ECF #132 at 388-89 – Campanella).   Accordingly, the CMP and the three-year strategic business plan laid out a plan to raise capital and increase the capital ratios.  (ECF #132 at 268 – Campanella).    Mr. Campanella testified that this plan was an objective, an intention, or a goal that the Board "desired" to accomplish.   (ECF #132 at 263-64 – Campanella).  This testimony comports with the actual language of the CMP and the three-year strategic business plan when taken as a whole.  The CMP, though purporting to set absolute capital limits "not to breached," also contemplates that these limits may be breached, and sets forth a plan of action to address any such breach.  Further, the limits listed in the CMP apply to the "collective capital positions" of AFC and the Bank.  The CMP does not clearly establish limits solely for the Bank's capital ratios.  With regard to the three-year business plan, the language of the plan itself establishes that it was meant to set forth plans or expectations based on current assumptions.  There is no language that creates a guarantee or commitment to achieve these expected results whether or not the current assumptions turn out to be invalid.  Taking into consideration the documents and testimony offered at trial, there is simply no evidence that either AFC or OTS considered the CMP or the three-year strategic business plan to be an enforceable commitment to maintain the capital of the Bank.

Unfortunately, despite its best attempts, due to the economic climate, AFC's attempts to raise additional capital for the Bank were unsuccessful, and the Bank's rating was downgraded.

-15-

(ECF #132 at 274, 391-92 – Campanella).   Thereafter, Cease and Desist Orders were issued by the OTS to both the Bank and to AFC . Both the Bank and AFC stipulated to their respective Orders, and AFC's Board and OTS worked closely together to try to reverse the downward spiral of the Bank.  (ECF # 132 at 277, 393-96, 406-08 – Campanella).  One of the means considered was to apply for TARP money from the federal government.  Because of the universal deterioration of the nations banks during this economic crisis, the federal government was offering "trouble asset money" or "TARP money" to purchase equity or assets of a bank in order to fortify the banks.  (ECF #132 at 277, 392 – Campanella).   The Bank made an application for TARP funds, but in the end, OTS decided not to forward it on, so the application was withdrawn. (ECF #132 at 288-89, 392-94 – Campanella).

AFC and the Bank, in consultation with OTS, considered several different options for restoring the Bank back to a position of good standing, and looked for ways that they could meet their obligations under the Cease and Desist Orders.  (ECF #132 at 311-321, 328, 406-08 – Campanella).  The three parties had multiple meetings, and engaged in extended negotiations and discussions about the possible courses of action for the Bank.  After full consideration of all of the options, AFC and the Bank submitted a Risk Reduction Plan that aimed to shrink the size of the Bank in the hopes that this would eventually lead to improved capital ratios.  The OTC accepted the Risk Reduction Plan with the caveat that it might withdraw its acceptance if the terms of the Plan were not timely met.  (ECF #132 at 327-334, 372).  The Risk Reduction Plan expressly disavowed any notion that AFC intended to provide any capital contributions in order to maintain the capital of the Bank.  The Plan clearly stated that it "assumes that no further capital contributions will be received from the holding company."

-16-

Evidence was also presented showing that On November 4, 2009, the OTS notified the Bank that it had become "Significantly Undercapitalized" and that it was subject to "Prompt Corrective Action" ("PCA") within the meaning of 12 U.S.C. § 1831o(b) and 12 C.F.R. § 565.4(b).   As a result, the Bank was required to submit a capital restoration plan or plan amendment.  In order for OTS to accept such a plan, it would have required AFC to guarantee that the Bank will comply with its plan until it is adequately capitalized for four consecutive quarters, and to provide appropriate assurances of performance.  The PCA Standard Form of Guarantee and Assurances that AFC would be required to sign as a condition for the acceptance of the PCA capital restoration plan included, among other things, a commitment that AFC contribute its own assets to ensure that the Bank met its capital requirements.  AFC never executed the standard Form of Guarantee and Assurances, or agreed to any such commitment to guarantee the capital of the Bank.  The parties do not dispute that had AFC signed this guarantee they would have been making a commitment to maintain the capital of the Bank.  However, their failure to do so constitutes powerful evidence that AFC never intended to make such a commitment at that time, or at any time prior.

Although it is clear that the Bank did not meet its obligations to create and/or maintain certain capital ratios, as contemplated in its Cease and Desist Order, the Bank's performance under its Order is not at issue in this case.   Rather, it is only the obligations created by Paragraphs 4 and 8 of AFC's Cease and Desist Order that are relevant in this action.   The plain language of Paragraph 4 requires only that AFC "submit a plan" as to how the Bank's required capital ratios may be achieved and maintained.  The testimony of both Mr. Campanella and Mr. McKee supports the finding that Paragraph 4 requires only that AFC "sumbit a plan," and does

-17-

not entail any commitment to achieve the plan's goal, or to actually maintain the capital of the Bank.

Paragraph 8, of AFC's Cease and Desist Order requires the Board of Directors of AFC to "ensure that [the Bank] complies with all of the terms of its Order to Cease and Desist issued by OTS on November 19, 2008."  The FDIC argues that this statement constitutes a "commitment" by AFC to "maintain the capital" of the Bank, however they have presented no credible evidence that either AFC or the OTS ever intended to create such a commitment.  There is also absolutely no evidence that the OTS ever attempted or intended to enforce any such commitment.  Both Mr. Campanella and Mr. McKee testified that there were never any enforcement attempts based on the alleged "commitment to maintain capital."

Although this case is brought by the FDIC, the FDIC was not a party to any of the agreements at issue, and was not involved in drafting any of the related documents.  In fact, the FDIC has no first-hand knowledge relative to the intent or meaning of any of the documents or agreements at issue.   Further, although the FDIC essentially stands in the shoes of the OTS for purposes of the Bank's bankruptcy proceedings, there is no evidence that the FDIC ever contacted anyone at the OTS  prior to filing its claim in the bankruptcy court, in order to determine whether the OTS intended to impose an obligation on AFC to maintain the capital of AmTrust Bank, or whether the OTS believed that AFC had agreed to any such a commitment,.

The FDIC presented three witnesses who had no personal knowledge about the transactions at issue.  Mr. Brauser testified about what capital ratios are, and how those ratios can be affected by various changes or events.  He offered no expert testimony on whether AFC actually made a commitment to maintain the capital of the Bank.  Mr. Meyer testified that he had

-18-

no knowledge of any commitment or alleged commitment until the day before his deposition when he saw the Cease and Desist Order for the first time.  He had no knowledge about the negotiation, intent, performance, or enforcement of the Cease and Desist Order.  Mr. Van Vickle claims to have read and relied on the Cease and Desist Order, but had no knowledge of any extrinsic evidence that would have helped to resolve the ambiguities in the language of the Order.  His testimony supported the finding that the language was ambiguous, but did not provide any support for the FDIC's ultimate position.

None of the FDIC witnesses provided sufficient testimony to support a finding that the CMP was or contained a commitment to maintain the capital ratios of the Bank.  In fact, Mr. Campanella, one of AFC's former board members, who was called by the FDIC "on cross-examination" during their case in chief, testified that the CMP was not a commitment to maintain capital ratios, and that the policy, including the three-year strategic business plan was understood to be "obsolete" in September of 2008.  (ECF #132 at 276, 385 – Campanella).  Mr. Campanella also testified that only the Bank, and not AFC was obligated by the Cease and Desist Orders to have  or maintain any specified level of capital or capital ratios, and that the Board of AFC did not commit to make any capital infusions, but only agreed to "review and determine" what the Bank was doing and to "attempt" to maintain the ratios.  (ECF # 132 at 376, 378 – Campanella).  Specifically, he testified that he did not understand Paragraph 8 of the Stipulated Cease and Desist Order to entail a guarantee of performance, but rather that it required AFC's Board to act "to the best of our ability in our capacity as directors and management" to see that the Bank met its obligations under its own Cease and Desist Order.  (ECF #132 at 308-09 – Campanella).  Further, he testified that Paragraph 4 required AFC to submit a plan, and that

-19-

they fulfilled that obligation through the submission of the Risk Reduction Plan.  (ECF #132 at

372 – Campanella).  He also testified that there were no conversations or documents he reviewed

as a board member of AFC that made him believe AFC had made a commitment to OTS to

infuse capital in the Bank or attain or maintain capital ratios, nor had anyone ever said that AFC

had made a capital commitment prior to the FDIC's filing in bankruptcy court.  (ECF #132 at

413-14 – Campanella).          Mr. McKee, who worked at OTS since 1989, was regional deputy

director of operations during most of the relevant time period, and has been Regional Director of

the OTS Central Region since June of 2009, also testified by deposition in the FDIC's case in

chief.  (ECF #132 at 427-28 – McKee).   He testified that Paragraph 4(a) of the Cease and Desist

Order did not include a commitment to maintain the capital of the Bank, but only created an

obligation to "submit a plan."  (ECF #132 at 445-46 – McKee).  The plain language of Paragraph

4(a) also clearly indicates that this is the only obligation contained in this section of the Cease of

the Desist Order.   Mr. McKee also testified that the alleged commitment in Paragraph 8 of the

Cease and Desist Order  was addressed only to the board's responsibility as "an overseeing

body," and implied through other testimony that this section did not create a commitment by

AFC to maintain the capital of the Bank.  (ECF #132 at 523).

        Aside from the above noted testimony, Mr. McKee gave other answers that alternatively

seemed to support and belie the FDIC's position that the three-year strategic business plan and

AFC's Stipulation to its Cease and Desist Order may have included a commitment to maintain

the capital of the Bank.  (ECF #132 at 458-59, 472-73, 506–08 – McKee).   Further, much of his

testimony did no more than read and reiterate the language of documents that he did not write,

and had not discussed with anyone at AFC.   Taken as whole, Mr. McKee's testimony was

-20-

equivocal at best and, in general, more directly supported AFC's position.  It certainly did not constitute sufficient evidence to meet the FDIC's burden of proof to show that AFC made an enforceable commitment to maintain the capital of the Bank.

## FINDINGS OF FACT/CONCLUSIONS OF LAW

The Court makes the following findings of fact and conclusions of law based upon the evidence presented at trial:

1.  The FDIC has the burden of proof with regard to each element of its claim under 11 U.S.C. § 365(o).

2.  A "commitment" as that term is used in Section 365(o), means an agreement or pledge that the parties to the transaction intended to be binding or enforceable.

3.  Evidence of the actual intent of AFC and OTS, as well as their behavior and conduct relating to the enforcement of the provisions at issue, are relevant to determining the meaning of ambiguous language in the documents at issue, and the interpretation principles of contract law apply in this context.

4.  A "commitment" as that term is used in Section 365(o), could also mean an obligation imposed by law.

5.  The CMP and the three-year strategic business plan were not, and did not contain, a commitment by AFC to maintain the capital of the Bank.  Rather, they contained a plan, projection, or description of a preferred course of action.

6.  The CMP and the three-year strategic business plan were terminated by an act of the OTS, when the OTS issued the Cease and Desist Order against AFC.

-21-

7.   Although a Cease and Desist Order may carry the force of law, there is no evidence that the terms of the Cease and Desist Order at issue in this case, imposed upon AFC, as a matter of law, an obligation to maintain the capital of the Bank.

8.   AFC's stipulation to Paragraph 4(a) of the Cease and Desist Order does not create a commitment by AFC to maintain the capital of the Bank, as the only requirement in this paragraph is an obligation to "submit a plan."

9.   The language in Paragraph 8 of AFC's Cease and Desist Order is ambiguous on its face.

10.   The evidence shows that Paragraph 8 was intended to create an obligation by the Board to oversee the Bank's attempt's to obtain and maintain specific capital rations, but there is no evidence that it was intended to create or impose an enforceable obligation by AFC to maintain the capital of the Bank.

11.   AFC's stipulation to Paragraph 8 of the Cease and Desist Order is not a commitment to maintain the capital of the Bank.

12.   The evidence does not suggest that AFC entered into bankruptcy in order "to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."  Therefore, there is no evidence that 11 U.S.C. § 365(o) was intended to address the circumstances present in this case.

13.   The documents that the FDIC identified as containing capital maintenance commitments (the CMP, the three-year strategic business plan, and AFC's Stipulation to the Cease and Desist Order) do not constitute or contain a commitment to maintain the capital of the Bank that is enforceable under 11 U.S.C. § 365(o).

14.  In light of the factual findings set forth above, the Court finds that the FDIC failed to present sufficient evidence to establish that either the OTS or the AFC understood or intended for the documents at issue to impose or create a commitment by AFC to maintain the capital of the Bank.

## CONCLUSION

For the foregoing reasons this Court finds in favor of the Defendant, AmFin Financial Corporation, and against Plaintiff, Federal Deposit Insurance Corporation, on its claims.  Costs are assessed to the Plaintiff.  IT IS SO ORDERED.


 /s/Donald C. Nugent
Judge Donald C. Nugent

DATED:  June 6, 2011